IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

COLLEEN BOWLING,                *
                                *
    Plaintiff,                  *
                                *
v.                              *       CV 113-55
                                *
ERIC SHINSEKI, Secretary,       *
Department of Veterans Affairs, *
                                *
    Defendant.                  *

---

O R D E R

---

Presently before the Court is Defendant Eric Shinseki's ("Defendant") motion for summary judgment. (Doc. 16.) Plaintiff, a former police officer with the Veterans Affairs Police Service, alleges that her termination and subsequent negative employment reference were acts of retaliation for complaints about sexual harassment by her training officer in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) ("Title VII"). As discussed below, Defendant's motion for summary judgment is **GRANTED**.

I. BACKGROUND

In May 9, 2010, Plaintiff was hired by the Department of Veterans Affairs Police Department as a police officer. (Doc. 17, Ex. 1.) Her hiring was subject to completion of a

probationary period of one year. (Id.) Plaintiff was assigned to Shift Supervisor Lieutenant Jerry Moore ("Moore"), and Lieutenant Quinn Bennett ("Bennett") was responsible for Plaintiff's training. (Id., Ex. 3 "Bowling Dep." at 10-11, 13.)

On August 11, 2010, while on duty, Plaintiff and Bennett went to the Richmond County firing range. (Id., Ex. 4 "EEO Hearing" at 41-42.) While there, both Bennett and Plaintiff used Veterans Affairs issued firearms and ammunition in order to complete state training certification. (Id.; Doc. 17, Ex. 11 "Williford Dep." at 45-48.) The unauthorized use of government property violated the Veterans Affairs' policy. (See Doc. 17, Ex. 6 at 13-14; Id., Ex. 17.)

Shortly after Plaintiff began her training, before the August 11, 2010 shooting range event, she and Bennett began text messaging each other, though the parties dispute who initiated the messages.[1] (Id., Ex. 9 "Bowling Letter"; Id., Ex. 7.) These text messages were of a mixed work and sexual nature. (Bowling Letter; Doc. 17, Ex. 7.) And while Plaintiff disputes whether any "relationship" existed, by her own testimony she considered the messaging to be part of a "certain amount of banter that goes into these professions that is not a big deal for me and for several people." (Bowling Dep. at 28.) Plaintiff alleges that Bennett inquired into her sex life, asking personal and

---

[1] Plaintiff maintains that, although she always responded, she never initiated any sexual messages.

2

sexually explicit questions.² (Bowling Letter.) After Bennett's wife discovered these text messages in September 2010, Plaintiff received an explicit and profane threatening text message from Bennett's wife. (Id.) Plaintiff was in Arkansas for training when the text was sent and, concerned for her health and safety, contacted Officer Kimberly Borresen ("Borresen"), a friend and colleague. (Id.; Bowling Dep. at 19-20.) Borresen then contacted Bennett and his wife to discuss the threat and later called Plaintiff to inform her the matter was handled and Plaintiff would not receive any more texts from Bennett. (Bowling Dep. at 20.)

Upon Plaintiff's return from Arkansas and at Moore's suggestion, Sergeant Lyn Banks ("Banks"), another Veterans Affairs employee, told Plaintiff she was no longer permitted to use her personal cell phone at work. (Id. at 20-21.) Plaintiff, visibly upset, and assuming the request had something to do with the Bennett situation, told Banks about what had transpired. (Id.) At this point, Banks instructed Plaintiff that she must report the relationship to Moore or Banks would do so herself. (Id.) On September 30, 2010, Plaintiff submitted a written statement to her supervisor detailing the entirety of her relationship with Bennett. (Bowling Letter.) In the

---

² Neither party has provided the Court with documentation of these text messages aside from Plaintiff's letter to her supervisor describing the messages.

3

letter, Plaintiff explained that she "was worried that [] Bennett or his wife would go to the Chief [] and [she] would not be there to defend [herself]." (Id.) Days later, Assistant Chief Tim Williford ("Williford"), Moore's supervisor, provided Plaintiff with an EEO Sexual Harassment Packet. (Bowling Dep. at 22-23.) Williford interviewed both Plaintiff[3] and Bennett following the complaint. (Doc. 17, Exs. 8, 10.) Defendant claims that it was during this investigation that it learned about Plaintiff's and Bennett's August trip to the shooting range, a fact Plaintiff vehemently disputes. (Compare id., Ex. 11 at 23-24 with id., Ex. 9.) Plaintiff does not dispute, however, that she and Bennett went to the range and completed the state certification, only that her superiors knew long before the investigation into the inappropriate messaging. (EEO Hearing at 41-42.) Following Williford's investigation, Police Chief Thomas Howe submitted a memo to Human Resources recommending that Plaintiff's employment be terminated. (Doc. 17, Ex. 15.) Before Human Resources approved the termination, Plaintiff received a performance appraisal from her supervisor in which she was rated as "fully successful." (Id., Ex. 16.) On November 1, 2010, Plaintiff received a termination letter dated October 29, 2010, identifying "unacceptable personal conduct and improper and unauthorized use of Department of

---

[3] Plaintiff was interviewed on October 13, 2010.

Veteran[]s Affairs equipment and supplies" as the cause of her firing.[4] (Id., Ex. 17.)

After being fired, Plaintiff initiated EEO proceedings. The EEO Administrative Hearing Officer concluded, after a thorough investigation, that Plaintiff failed to prove disparate treatment on the basis of sex, retaliation, or hostile work environment. Bowling v. Shinseki, EEOC No. 410-2011-00326X (December 12, 2012).

Also after her firing, Plaintiff applied for a job with the Richmond County Sheriff's Department and, on November 19, 2010, signed a "Release of Information Waiver," which authorized "full and complete disclosure of all employment and pre-employment records."[5] (Doc. 17, Ex. 18.) On January 6, 2011, Williford completed an employment reference for Plaintiff that described her integrity as "below average" and stated that she was "[r]eleased during probation due to unacceptable personal conduct and improper and unauthorized use of Department of Veteran[]s Affairs equipment and supplies." (Id.)

---

[4] Bennett was also fired following the investigation. (Bowling Dep. at 68.)

[5] The waiver also contained the following statement: "I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for giving this information; and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information." (Doc. 17, Ex. 18.)

5

Based upon these facts, Plaintiff filed two claims in this Court, both asserting that she was retaliated against for her September 30, 2010 complaint of Bennett's sexual harassment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one

6

of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick,

7

2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave Plaintiff appropriate notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 18.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.

### III. DISCUSSION

Plaintiff alleges Defendant retaliated against her in the following two ways: (1) her termination on November 1, 2010, and (2) a subsequent negative employment reference.

To successfully set forth a claim of retaliation under Title VII, the plaintiff must first establish a prima facie case of retaliation. Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). If this prima facie case is met, a presumption of retaliation arises and the burden shifts to the defendant to "proffer a legitimate, non-retaliatory reason for the adverse employment action." Id. If the defendant sets forth such a reason, the presumption disappears and the plaintiff must show that the reasons stated were merely a pretext. Id.; Masso v. Miami-Dade Cnty., 465 F. Supp. 2d 1260, 1264-54 (S.D. Fla. 2006).

"A prima facie case of retaliation contains three elements: 'first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse employment action; and finally, the adverse action was causally related to the protected expression.'" Williams v. Motorola, Inc., 303 F.3d 1284, 1291 (11th Cir. 2002) (quoting Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999)). In determining whether activity is statutorily protected, the Supreme Court and Eleventh Circuit have recognized two categories of activity: "An employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an

9

investigation, proceeding, or hearing under this subchapter' (the participation clause)." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1350 (11th Cir. 1999) (quoting 42 U.S.C. § 2000e-3(a)).

Plaintiff alleges she was participating in opposition activity with her internal complaint. When proceeding under the opposition clause, the plaintiff need not prove the underlying discrimination claim, but must demonstrate "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002) (internal quotation marks omitted).

> It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that [s]he subjectively (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was objectively reasonable in light of the facts and record presented.

Id. at 1312 (quoting Little v. United Tech., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997)). "And although the alleged conduct need not actually be sexual harassment to support a retaliation claim, the conduct must be close enough to support an objectively reasonably belief that it is." Tatt v. Atlanta Gas Light Co., 138 F. App'x 145, 148 (11th Cir. 2005) (internal quotation marks omitted).

Plaintiff alleges that she was the victim of sexual harassment by her training officer, Lieutenant Bennett. To support a sexual harassment claim, a plaintiff must show that:

> (1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors or other conduct of a sexual nature; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment; and (5) a basis for holding the employer liable.

Smith v. Am. Online, Inc., 499 F. Supp. 2d 1251, 1260 (M.D. Fla. 2007). In determining whether conduct is "sufficiently severe or pervasive" the Supreme Court and the Eleventh Circuit have identified four probative factors: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is threatening or humiliating, and (4) whether the conduct unreasonably interferes with work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); Allen v. Tyson Foods, Inc., 121 F.3d 642, 647 (11th Cir. 1997).

Critically, the Supreme Court in Harris held that "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." Harris, 510 U.S. at 21-22. "[S]exual harassment is subjectively severe and pervasive if the complaining employee perceived it to

11

be at the time." Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1248 (11th Cir. 2004); Williams v. General Motors Corp., 187 F.3d 553, 566 (11th Cir. 1999) ("[T]he victim must subjectively perceive the environment to be abusive[.]" (quoting Harris, 510 U.S. at 21)).

In the case at bar, even drawing all inferences in Plaintiff's favor, Plaintiff has failed to show that she had any belief that her employer was engaging in severe or pervasive sexual harassment when the complaint was made, let alone a reasonable, good faith belief. Even assuming Bennett was Plaintiff's supervisor and could thus expose Defendant to liability, it is clear that Plaintiff did not take offense to the comments until after Bennett's wife sent a threatening text message, which coincidentally marked the end of all personal messages.[6] (See generally Bowling Dep.) Plaintiff, in her September 30, 2010 letter stated that she "took these comments as innocent flirting and dismissed them" and "was not too bothered by the comments because [she] really just didn't care and [] was not offended." (Bowling Letter.) In fact, Plaintiff admittedly texted Bennett once saying "Hey hottie[.]" (Id.) Furthermore, in Plaintiff's interview with Assistant Police Chief Williford, she stated that she "played along just

---

[6] According to Plaintiff's testimony before the EEO Investigator, she did not receive any more phone calls or text messages from Bennett upon her return from Arkansas. (Bowling Dep. at 52-53.)

12

flirting" and emphasized that "[w]hen someone pays attention to you, it is fun for a while[.]" (Doc 17, Ex. 10.) In her interview with the EEO investigator, Plaintiff stated that she "always respond[ed] to [Bennett's] text messages" and that she "laughed [him] off" because "[the text messaging was] not a big deal[.]" (Bowling Dep. at 28.) When asked if prior to Bennett's wife's threat Plaintiff ever asked Bennett to stop, she responded "[n]o, there wasn't anything to tell him to stop. It was not an issue." (Id. at 29-30.)

It is clear that it was not Bennett's text messaging, and a belief that he violated Title VII, that led to Plaintiff's complaint to her supervisor, but that the confrontation with his wife might lead him to "set[] up a case for himself and mak[e] it seem as though [Plaintiff] had done something wrong." (Bowling Letter.) In closing her September 30th letter, Plaintiff even said "I feel the threat to my life from [Bennett's wife] took things to a whole other level and after much thought I decided it would be best to let someone know about the situation." (Id.) In fact, during her interview with Williford, Plaintiff said "I want to be fair. [The text messages were] no big deal. I thought I could handle resolving it. I was willing to let it go until his wife got involved and I realized it was out of my control." (Id., Ex. 10.)

13

The circumstances that led up to Plaintiff's internal complaint are also instructive. When Plaintiff was told by Banks not to use her personal phone on duty, Plaintiff inquired as to why and "got immediately upset, because [she] assumed that it was in reference to all these text messages and being threatened." (Bowling Dep. at 20-21.) It was only after Banks told Plaintiff that she must report the situation that Plaintiff contacted her supervisor. (Id. at 21.) In Plaintiff's own words, she did not want to give a statement regarding the text messages dating back to the first day of her employment because "nothing serious had happened up to that point until I was threatened[.]" (Id. at 22.) Finally, when asked by the EEO Investigator how she felt the events created a hostile work environment, Plaintiff responded, "[w]hile I was employed there, the only time I had a hostile work environment [was] when I went to them with my complaint and they put me in a situation of being in the same building with that lieutenant and took no action." (Id. at 80.)

Based on the foregoing, it is abundantly clear to the Court that Plaintiff did not hold a reasonable, good faith belief that she was subjected to severe or pervasive conduct that would alter the terms and conditions of her employment. Compare Tatt, 138 F. App'x at 148-49 (holding that plaintiff failed to establish a good faith belief of sexual harassment where the

14

conduct involved feigned urination on paperwork once a week for two years because the *supervisor's* conduct did not physically threaten or humiliate plaintiff, the conduct did not interfere with her job performance, and plaintiff failed to report it until after she received a negative performance evaluation) and Mendoza v. Borden, Inc., 195 F.3d 1238, 1247-48 (11th Cir. 1999) (holding that an employer's conduct is not sufficiently severe or pervasive where the employer told the plaintiff "I'm getting fired up," rubbed against her, followed her around, and made sniffing noises while staring at her) with EEOC v. SDI Athens East, LLC, 690 F. Supp. 2d 1370, 1379-80 (M.D. Ga. 2010) (holding that the plaintiff subjectively perceived the harassment to be severe and pervasive where plaintiff's supervisor frequently touched her, sometimes in a sexual manner, and made vulgar comments making plaintiff feel depressed, ashamed, and embarrassed). Plaintiff admittedly found the text messaging to be "so sporadic" and "no big deal" that she only filed a complaint after she was threatened, though not by an employee of Defendant. (Bowling Dep. at 32; Doc. 17, Ex. 10 at 4.) In fact, her "only worry was that it was going to be shown in a negative light, and [she would not be] there to defend [herself]." (Bowling Dep. at 50.) As such, she has failed to show that she believed her employer was engaged in an unlawful employment practice, *i.e.* sexual harassment, and thus she cannot

establish that she engaged in statutorily protected activity. Accordingly, Defendant cannot be held liable for retaliation and summary judgment for Defendant is proper.

## IV. CONCLUSION

For the reasons set forth above, Defendant Eric Shinseki's motion for summary judgment (Doc. 16) is **GRANTED**. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendant. The Clerk shall terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this 4th day of November, 2014.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA